USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
DAVID T. VINING, Individually :
and on behalf of all others   :
similarly situated,           :
                              :
              Plaintiff,      :
                              :
         -against-            :
                              :
OPPENHEIMER HOLDINGS INC. and :
OPPENHEIMER & CO., INC.,      :
                              :
              Defendants.     :
-------------------------------X

08 Civ. 4435(LAP)


OPINION AND ORDER

LORETTA A. PRESKA, Chief United States District Judge:

Plaintiffs David T. Vining ("Vining") and Patricia Burness ("Burness") (collectively "Plaintiffs") bring this purported class action against defendants Oppenheimer Holdings Inc. ("Oppenheimer Holdings") and Oppenheimer & Co., Inc. ("Oppenheimer") (collectively "Defendants") asserting claims of securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b) (2006), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. Plaintiffs also allege violations of Section 20(a) of the Securities Exchange Act ("Section 20(a)"). 15 U.S.C. § 78t(a). Plaintiffs' claims stem from their purchase of auction rate securities ("ARS") from Oppenheimer. Defendants now move to dismiss the Second Amended Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") for failure to

state a claim upon which relief may be granted.  For the reasons
stated below, Defendants' motion is GRANTED.


I.   BACKGROUND

   A.   Parties

   Plaintiff Vining is an investor who purchased ARS through
Oppenheimer in March 2007 and again in May 2007. (Compl. ¶¶ 117-
21.)  Plaintiff Burness is a trustee who purchased ARS on behalf
of the Patricia G. Burness Revocable Trust through Oppenheimer
between October 31, 2007 and February 5, 2008. (Id. ¶¶ 134-35.)
Plaintiffs purport to bring this action on behalf of all persons
or entities who purchased ARS from Oppenheimer between March 19,
2003 and February 13, 2008 ("Class Period") and who were damaged
thereby. (Compl. ¶ 2.)

   Defendant Oppenheimer Holdings is a middle-market
investment bank and full-service investment dealer. (Id.
¶ 13.)  During the Class Period, Oppenheimer Holdings was a
Canadian corporation headquartered in Toronto, Ontario. (Id.)
In May 2009, it rechartered as a Delaware corporation and moved
its headquarters to New York, New York. (Id.)

   Defendant Oppenheimer is a wholly-owned subsidiary of
Oppenheimer Holdings. (Id. ¶ 14.)  Oppenheimer is incorporated
in Delaware and has its principal offices in New York, New York.
(Id.)  It is registered with the SEC as a broker-dealer pursuant

2

to Section 15(b) of the Exchange Act and is a member of the New
York Stock Exchange, the Financial Industry Regulatory
Authority, and the Securities Investor Protection Corporation.
(Id.)  Oppenheimer sold ARS to Plaintiffs during the Class
Period.  (Id.)

### B.   Auction Rate Securities

ARS are long-term or perpetual variable-rate equity or debt
instruments that pay interest or dividends at rates set at
periodic auctions. (Id. ¶ 26.)  ARS are issued by various
entities, including states, municipalities, public or private
student loan originators and lenders, and corporations. (Id.
¶ 27.)  During the period in question, ARS were traded at par
value through periodic "Dutch" auctions, typically held every
seven, twenty-eight, thirty-five, or forty-nine days. (Id.
¶ 30.)  The auctions allowed participants to submit orders to
buy, sell, or hold ARS at a particular rate. (Id.)  An auction
would determine which investors owned the securities as well as
the "clearing rate," the rate of interest or dividends paid on
those securities until the next auction. (Id.)

An ARS issuer would designate a firm to act as the dealer
through which investors submitted bids for the issuer's
securities. (Id. ¶ 32.)  This firm was known as an "auction
dealer" and typically also underwrote the ARS issuance. (Id.)

3

Investors were also permitted to submit bids for auctions
through other designated brokerages, such as Oppenheimer. (Id.)

In a successful auction, the number of bids to buy at a
particular rate was equal to or greater than the number of
securities being offered for sale at that rate. (Id. ¶ 33.)  The
clearing rate would thus be the lowest rate at which all sale
orders could be fulfilled. (Id.)  If the number of sellers
exceeded the number of willing buyers, the auction would fail.
(Id. ¶ 34.)  If an auction failed, holders would be unable to
sell their shares but would be entitled to collect dividends or
interest at a pre-determined rate, known as the "maximum rate,"
until the next auction. (Id.)

In order to prevent failed auctions and ensure ARS
liquidity, auction dealers frequently intervened in auctions by
placing "support bids" to purchase ARS for their own accounts,
thereby ensuring adequate demand in the auctions. (Id. ¶ 37-38.)
The auction dealers' intervention policies created the
impression that ARS were highly liquid investments when, in
fact, the liquidity of the market depended on the continued
support of the dealers. (Id. ¶ 43-44.)  By intervening in the
auctions, auction dealers were also able to set the clearing
rates. (Id. ¶ 46.)  As a consequence of continuous intervention
to prevent failed auctions, auction dealers carried large ARS
inventories. (Id. ¶ 47.)  The dealers, with the help of

brokerages like Oppenheimer, reduced excess inventory between auction periods by selling ARS to investors at previously established rates. (Id.)

The uniform policy of placing support bids to prevent auction failures came to an end in August 2007 when several auction dealers declined to place bids in auctions for ARS that were backed by collateralized debt obligations and other risky investments. (Id. ¶ 39.)  With the exception of auctions involving these particular securities, auction dealers continued to place support bids and prevent the failure of other auctions until February 2008. (Id.)  Around February 13, 2008, all major auction dealers refused to place support bids in any auctions and, as a result, eighty-seven percent of all ARS auctions failed. (Id. ¶ 49.)  The ARS market consequently collapsed, rendering around $300 billion of ARS illiquid. (Id. ¶ 51.)

C.   Plaintiffs' Purchase of Auction Rate Securities

Vining purchased ARS through a financial advisor named Bert Gilbert in Oppenheimer's Boston office. (Id. ¶ 117.)  Vining kept money with Oppenheimer in money market funds. (Id.)  In March 2007, Gilbert contacted Vining and recommended that he use his money market fund holdings to purchase ARS. (Id. ¶ 118.)  Gilbert described ARS as "better than cash" because the securities were readily liquid but offered a greater rate of

return than money market funds. (Id.)  Vining informed Gilbert that he needed immediate access to the money because of a large anticipated tax bill. (Id. ¶ 119.)  Vining authorized Gilbert to purchase ARS for his account around March 26, 2007 and again around May 8, 2007. (Id. ¶ 121.)

Neither Gilbert nor any other representative of Oppenheimer provided Vining with any additional information regarding ARS, the condition of the ARS market, or the practices of auction dealers in supporting the ARS auctions. (Id. ¶¶ 122-27.)  After the ARS market collapsed, Vining was stuck holding illiquid ARS and was unable to access his principal investment. (Id. ¶ 128.)  Some of Vining's ARS have been redeemed by issuers, but he continues to hold illiquid ARS that he purchased from Oppenheimer. (Id. ¶ 129.)

Burness purchased ARS from Oppenheimer through David Carey, a financial advisor in Oppenheimer's San Francisco office. (Id. ¶ 131.)  In late October 2007[1], while discussing short-term investments, Carey recommended that Burness purchase ARS. (Id. ¶ 132.)  Carey described ARS as highly liquid, cash-like investments that offered higher rates of return than other cash management instruments. (Id.)  Burness authorized Carey to

---

[1] The Complaint states that this conversation took place in October 2008, but the correct date appears to be October 2007 because the Complaint later states that the ARS sales occurred in October and November 2007 and February 2008. (See Compl. ¶¶ 134-135.)

purchase ARS for the trust's account around October 31, 2007.
(Id. ¶ 134.)  She authorized the purchase of additional ARS
between November 6, 2007 and February 5, 2008. (Id. ¶ 135.)  The
ARS purchased for Burness on February 5, 2008 were underwritten
by Oppenheimer, but Burness was not informed of this fact. (Id.
¶ 137.)

Neither Carey nor any other representative of Oppenheimer
provided Burness with any additional information regarding ARS,
the condition of the ARS market, or the practices of auction
dealers in supporting the ARS auctions. (Id. ¶ 138-42.)
Burness also was not informed that several ARS auctions had
failed in the weeks prior to February 5, 2008. (Id. ¶ 137.)
Although some of Burness's ARS have been repurchased by issuers,
she continues to hold illiquid ARS purchased from Oppenheimer.
(Id. ¶ 143.)

D.   Oppenheimer's Alleged Misrepresentations and
     Omissions

Plaintiffs allege that Oppenheimer directed its financial
advisors to represent ARS as cash-equivalent, highly liquid,
short-term investment vehicles when, in fact, ARS have long-term
maturity dates and there is no guarantee that investors will be
able to liquidate their holdings if auction dealers decide not
to place support bids to prevent auction failures. (Id. ¶ 101-

02.)  According to Plaintiffs, the financial advisors omitted various material facts about ARS, the nature of the ARS market, and the alleged conflict of interest that existed between Oppenheimer's investment banking and brokerage businesses.  (Id. ¶¶ 103-05.)

In regard to ARS generally, Plaintiffs allege Oppenheimer failed to disclose the following material facts: (1) ARS were long-term financial instruments with maturity dates of thirty years or longer; (2) ARS maximum rates were too low to ensure liquidity in the event of auction failures; (3) the appearance of liquidity was the result of artificial demand created by auction dealers' intervention in the market; (4) the cessation of auction dealer intervention would result in a loss of liquidity; (5) in the event of auction failures, ARS would only be salable at a substantial discount from their purchase price; and (6) the absence of active investor participation in the bidding process allowed auction dealers to manipulate the market to a greater degree. (Id. ¶ 103.)

In regard to the general condition of the ARS market, Plaintiffs allege that Oppenheimer failed to disclose that auction dealers used a variety of practices to manipulate the ARS market and prevent failed auctions. (Id. ¶ 104.)  The Plaintiffs also allege that Oppenheimer failed to disclose that the ARS market was under increasing stress, as exhibited by

auction dealers' increasing ARS inventories and the initial auction failures in 2007, and that withdrawal of support for the auctions by any single auction dealer would cause the ARS market to collapse. (Id.)

Plaintiffs allege that Oppenheimer failed to disclose that it underwrote ARS and that it compensated its brokers for selling securities that encouraged the growth of its investment banking business. (Id. ¶ 105.)  Additionally, Plaintiffs allege that Oppenheimer continued to underwrite ARS after the market was already saturated, thereby creating additional pressure on Oppenheimer's financial advisors to sell those securities. (Id.)

Finally, Plaintiffs allege that Oppenheimer allegedly identified ARS as "Cash Equivalents" on its clients' account statements until after the collapse of the ARS market, when the account statements began listing ARS as "Other Securities." (Id. ¶ 113.)

## II.   DISCUSSION

### A.   Standard for Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)).  "A pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Moreover, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citations omitted). In assessing whether a plaintiff has met this standard, the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation omitted).

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the district court is normally required to look only to the allegations on the face of the complaint." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." Id. Accordingly, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI

Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Securities fraud claims must also meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). ATSI Commc'ns, 493 F.3d at 99. A complaint alleging securities fraud must abide by Rule 9(b)'s requirement that "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, 493 F.3d at 99. "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA applies to the element of scienter. ATSI Commc'ns, 493 F.3d at 99. Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976))). In order adequately to plead scienter, "'the complaint shall, with respect to each act or omission

alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. (quoting 15 U.S.C. § 78u-4(b)(2)).

    B.   Section 10(b) Claim

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j (2006).  Rule 10b-5, adopted pursuant to Section 10(b), provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

The Supreme Court has implied from Section 10(b) that the statute affords a cause of action to purchasers or sellers of securities injured by its violation. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318 (2007).  An adequate Section 10(b) claim must allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the

12

plaintiff's reliance was the proximate cause of its injury."
ATSI Commc'ns, 493 F.3d at 105.

> 1.   Plaintiffs have failed to allege facts supporting
>      a strong inference of scienter

Assuming, in arguendo, that Plaintiffs have adequately
pleaded the existence of material misstatements or omissions,
the Complaint nonetheless fails adequately to allege scienter.
According to the PSLRA, to survive a motion to dismiss, a
plaintiff must allege facts from which a strong inference can be
made that the defendant acted with the requisite mental state.
15 U.S.C. § 78u-4(B)(2) (2006).  As mentioned above, scienter is
"'a mental state embracing intent to deceive, manipulate, or
defraud.'" Tellabs, 551 U.S. at 319 (quoting Hochfelder, 425
U.S. at 193 n.12).  In evaluating whether a complaint gives rise
to a strong inference of scienter, the court "must consider the
complaint in its entirety . . . [and] take into account
plausible opposing inferences." Tellabs, 551 U.S. at 322-23.

A plaintiff may plead scienter by alleging facts
"(1) showing that the defendants had both motive and opportunity
to commit the fraud or (2) constituting strong circumstantial
evidence of conscious misbehavior or recklessness." ATSI
Commc'ns, 493 F.3d at 99.  Conscious recklessness implies "'a
state of mind approximating actual intent, and not merely a

13

heightened form of negligence.'" South Cherry St., LLC v.

Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009).  The type

of motive required to plead scienter "entail[s] concrete

benefits that could be realized by one or more of the false

statements and wrongful nondisclosures alleged." Novak v.

Kasaks, 216 F.3d 300, 307 (2d Cir. 2000).  The Court of Appeals

has cautioned that

> litigants and courts need not and should not employ or
> rely on magic words such as 'motive and opportunity'
> with respect to intent; but that, in accordance with
> [] prior cases, a strong inference of the requisite
> state of mind may arise where the complaint
> sufficiently alleges that the defendants:
> (1) benefitted in a concrete and personal way from the
> purported fraud . . .; (2) engaged in deliberately
> illegal behavior . . .; (3) knew facts or had access
> to information suggesting that their public statements
> were not accurate . . .; or (4) failed to check
> information they had a duty to monitor . . . .

South Cherry St., 573 F.3d at 110 (internal quotations omitted).

"The inference that the defendant acted with scienter need

not be irrefutable, i.e., of the smoking-gun genre, or even the

most plausible of competing inferences." Tellabs, 551 U.S. at

324 (internal quotation marks omitted).  However, "[a] plaintiff

alleging fraud under § 10(b) must plead facts rendering an

inference of scienter at least as likely as any plausible

opposing inference.'" Tellabs, 551 U.S. at 328.

It should also be noted that "[c]orporate officials need

not be clairvoyant; they are only responsible for revealing

those material facts reasonably available to them.  Thus,
allegations that defendants should have anticipated future
events and made certain disclosures . . . do not suffice to make
out a claim of securities fraud." Novak, 216 F.3d at 309
(citation omitted).  The Court of Appeals has consistently
rejected such allegations of "fraud by hindsight." Id.; see,
e.g., Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir.
1999) ("Management's optimism that is shown only after the fact
to have been unwarranted does not, by itself, give rise to an
inference of fraud.").

Additionally, "[w]hen the defendant is a corporate entity,
. . . the pleaded facts must create a strong inference that
someone whose intent could be imputed to the corporation acted
with the requisite scienter." Teamsters Local 445 Freight Div.
Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir.
2008).  "In most cases, the most straightforward way to raise
such an inference for a corporate defendant will be to plead it
for an individual defendant.  But it is possible . . . 'to draw
a strong inference of corporate scienter without being able to
name the individuals who concocted and disseminated the fraud.'"
Id. (quoting Makor Issues & Rights, Ltd. v. Tellabs Inc., 513
F.3d 702, 710 (7th Cir. 2008)).

Plaintiffs point to several facts that they assert lead to
a strong inference that Oppenheimer acted with scienter:

15

(1) Oppenheimer benefitted financially from the perpetuation of the ARS market, (Compl. ¶¶ 53-60); (2) Oppenheimer knew, or was reckless in not knowing, that ARS maximum rates were insufficient to ensure liquidity in the event of a failed auction, (Id. ¶¶ 61-64); (3) Oppenheimer was privy to non-public information, including dealers' ARS inventories, that allowed it to provide bidding guidance to certain investors and thereby influence the clearing rate, (Id. ¶¶ 65-68); (4) Oppenheimer knew, or was reckless in not knowing, that the ARS market was under increasing stress and was collapsing, (Id. ¶¶ 69-89); and (5) Oppenheimer insiders sold their own ARS holdings while the market was deteriorating, (Id. ¶¶ 90-97).

### i.   Motive and Opportunity

Oppenheimer's profit motive in perpetuating the ARS market in order to maintain relationships with auction dealers and grow its underwriting business is "a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, [and] is not sufficiently concrete for purposes of inferring scienter." Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001); see also Novak, 216 F.3d at 307-08 (noting that plaintiffs have not been permitted to proceed based on motives possessed by virtually all corporate insiders, including "(1) the desire to maintain a high corporate credit rating or otherwise sustain the

appearance of corporate profitability, or of the success of an investment, and (2) the desire to maintain a high stock price in order to increase executive compensation or prolong the benefits of holding corporate office") (internal quotation marks and citations omitted); In re Citigroup Auction Rate Sec. Litig., --- F. Supp. 2d ----, 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009) (holding that desire to sell ARS to offset other losses and to obtain fees through running auctions is insufficient motive to give rise to strong inference of scienter); Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217-18 (S.D.N.Y. 2009) (holding that motive "to perpetuate the artificial ARS market so that [defendant] could earn substantial sales commissions and fees for underwriting the securities and managing ARS auctions" is insufficient for purposes of inferring scienter).

It should also be noted that Plaintiffs' allegation that Oppenheimer was motivated in selling ARS by its desire to perpetuate the ARS market and reap underwriting fees is inconsistent with their allegation that Oppenheimer knew the market was collapsing.  Of course, if Oppenheimer knew that it was "inevitable that that the auction dealers would eventually withdraw their support for the auctions," (Compl. ¶ 52), then there would be no motive to curry favor with auction dealers

because there would be no future underwriting opportunities to be awarded.

Plaintiffs' allegations of insider sales are similarly insufficient to support a strong inference of scienter. Plaintiffs are correct that the requirement that defendants have benefitted in some concrete or personal way from the purported fraud is satisfied "when corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." Novak, 216 F.3d at 308.   Therefore, "'[u]nusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001) (citing Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)).

"Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. at 74-75.  This information is particularly necessary when arguing for an adverse inference from the sale of a security being used as a short-term cash management vehicle that is subject to frequent auctions.  Plaintiffs provide the volume of ARS sold by a number

18

of Oppenheimer executives, but fail to state the portion of
stockholdings sold or the change in volume of insider sales.
Nor do Plaintiffs specify what non-public information these
Oppenheimer insiders were allegedly trading on between January
2007 and February 2008.  The Plaintiffs do state that most of
the sales occurred after the initial auction failures in August
2007, which were known to the public.  Given the lack of
information in the Complaint, no inference of fraud can be drawn
from the allegations. See Ashland Inc., 689 F. Supp. 2d at 886
(finding that allegations of ARS sales by the same Oppenheimer
executives did not raise an inference of scienter because "the
more logical inference is that these sales were based on
information in the public domain").  Plaintiffs' argument that
future discovery will more fully develop these allegations is
unavailing; the purpose of the PSLRA's heightened pleading
standard is to avoid subjecting defendants to discovery on the
basis of bare, conclusory claims. See Novak, 216 F.3d at 310
("[A]doption of a 'strong inference' standard will substantially
heighten the barriers to pleading scienter, a result Congress
expressly intended.") (internal quotation marks omitted).

### ii.  Circumstantial Evidence of Scienter

In order to raise a strong inference of scienter by means
of circumstantial allegations, Plaintiffs must allege that

Oppenheimer engaged in conduct that was "highly unreasonable and which represent[ed] an extreme departure from the standards of ordinary care." Novak, 216 F.3d at 308.  Where a complaint fails to allege motive, "the strength of circumstantial allegations of conscious misbehavior or recklessness 'must be correspondingly greater.'" In re Bayer AG Sec. Litig., No. 03 Civ. 1546 (WHP), 2004 WL 2190357, at *43 (S.D.N.Y. Sept. 30, 2004) (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)); see also In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 529 n.21 (S.D.N.Y. 2009) ("[F]ail[ure] to allege a proper 'concrete and personal' benefit . . . certainly makes competing, non-fraudulent inferences more 'compelling' for purposes of the Tellabs analysis.").  Plaintiffs argue that Oppenheimer knew that ARS liquidity depended on auction dealer intervention and that there was an increasing likelihood that the broker dealers would withdraw from the market.  This information, Plaintiffs argue, should have suggested that Oppenheimer's statements about ARS were inaccurate.

As an initial matter, the parties dispute the time period on which the scienter inquiry should focus.  Vining purchased ARS in March and May 2007. (Compl. ¶ 121.)  Burness purchased ARS in October and November 2007 and February 2008. (Id. ¶ 135.) Except for Burness's discussion with Carey in late October 2007, however, Burness does not allege that she relied on any specific

misrepresentations in making her subsequent purchases. (Id. ¶ 132.)  The Plaintiffs attempt to focus on what Oppenheimer knew after October 2007 by arguing that Oppenheimer continued to misrepresent the nature of ARS on its clients' account statements up until the collapse of the ARS market. (Id. ¶ 112.) Because the Plaintiffs fail to allege that Burness received, read, or relied on any such account statements, this allegation is insufficiently specific to buttress Plaintiff's misrepresentation claim.  See ATSI Commc'ns, 493 F.3d at 105.

The Plaintiffs also argue that the relevant time period should extend until February 2008 because Oppenheimer had a duty to update clients when Oppenheimer realized that the ARS market was about to collapse. See In re IBM Corp. Sec. Litig., 163 F.3d 102, 110 (2d Cir. 1998) ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event.").  Oppenheimer counters that a broker has no duty to offer unsolicited information, advice, or warnings concerning an investment in a nondiscretionary account. See de Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293 (2d Cir. 2002) ("It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis.").  Assuming, without deciding, that Oppenheimer had a duty to update Burness before her February 5, 2008 purchase——and therefore assuming that the

21

relevant time frame for assessing scienter extends until February 2008—Plaintiffs have still failed sufficiently to allege scienter.

Plaintiffs point to Oppenheimer's knowledge of several facts that purportedly contradict the statements made to Plaintiffs: (1) general knowledge regarding auction dealers' intervention in the ARS auctions; (2) general knowledge regarding features of ARS, including the low maximum rates; (3) knowledge regarding the failed auctions in August 2007; and (4) knowledge regarding auction dealers' increasing ARS inventories from 2007 to 2008.

The knowledge that auction dealers' intervention in the market was the sole guaranty of continued liquidity and that maximum rates were too low to ensure liquidity in the event of auction failures does not raise an inference that Oppenheimer knew or was reckless in not knowing that the dealers' intervention would cease.  The ARS market had allegedly existed for over twenty years with auction dealers following "uniform policies of placing support bids in auctions as necessary to prevent auction failures." (Compl. ¶ 28, 39.)  Simply knowing what would happen if those policies changed does not equate with knowing that they would change.

The Plaintiffs attempt to make this connection by arguing that the initial auction failures in August 2007 in the

collateralized debt obligation-backed ARS market indicated that the ARS market as a whole was collapsing.  Because the auction failures took place after Vining's last purchase of ARS, they are irrelevant as to him. (Id. ¶ 121.)  In regard to Burness, the auction failures took place two months before she bought ARS. (Id. ¶ 134.)  By Plaintiffs' own admission, however, the failures took place only in "a small fraction of the entire auction rate securities market" that market participants considered particularly risky and undesirable. (Id. ¶ 39, 76.)

The Plaintiffs also allege that Albert Lowenthal, Chairman and CEO of Oppenheimer Holdings, chose to monitor the ARS market after the August 2007 failures and received daily hand-delivered memos identifying auction failures. (Id. ¶ 81.)  But the Plaintiffs do not allege that his daily reports contained specific information that would have alerted him to the impending collapse of market.  In fact, the Plaintiffs allege that no other failures occurred in the rest of the ARS market before January 23, 2008. (Id. ¶¶ 39, 86.)

The Plaintiffs come closer to raising an inference of scienter with the allegation that Lowenthal instructed another Oppenheimer executive not to inform Oppenheimer's financial advisors about the August 2007 auction failures. (Id. ¶ 80.)  The Plaintiffs do not specify when—aside from after the beginning of the failures—Lowenthal gave this instruction.

Moreover, "[i]n the absence of [] information [regarding the contents of Lowenthal's daily memos], it is difficult to assess the implications of Lowenthal's instruction." See Ashland Inc., 689 F. Supp. 2d at 887 (rejecting plaintiff's assertion that Lowenthal's daily updates and instruction raised a strong inference of scienter).

The Plaintiffs also allege that Oppenheimer knew that auction dealers' ARS inventories were expanding between August 2007 and the market's collapse in February 2008. (Id. ¶¶ 69-75.) This expansion is irrelevant to Vining's claims because it occurred after his last purchase of ARS.  Moreover, Plaintiffs have failed to point to any specific report containing this information.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309 (citing San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 812 (2d Cir. 1996)) (holding that unsupported claim of the existence of confidential company reports is insufficient to survive a motion to dismiss). The generalized allegation that Greg White, Managing Director of Oppenheimer's Auction Rate Department, "had access to computerized spreadsheets or databases detailing the auction dealers' inventory of auction rate securities" is therefore

insufficient to raise a strong inference of scienter. See Novak, 216 F.3d at 309.

The Plaintiffs' reliance on several events that allegedly took place in January and February 2008 is likewise misplaced. The Plaintiffs allege that Oppenheimer officials discussed "worst case thoughts on [] potential counterparty risk" in January 2008; observed substantially increased inventories in February 2008; observed Lehman Brothers and Piper Jaffray allow auctions to fail in January 2008; and observed Goldman Sachs allow an auction to fail in February 2008. (Compl. ¶¶ 84–88.) But the Plaintiffs do not identify specific facts to support their conclusory assertion that Oppenheimer knew that "[i]f one auction dealer exited the market or permitted widespread auction failures, a 'run on the bank' would ensue, with panic selling by investors, and all other auction dealers being forced to choose between attempting to sustain the auction rate securities market by buying all securities offered at auctions and allowing the auctions to fail en masse." (Id. ¶ 83.)

The Plaintiffs come closer to raising an inference of scienter with the allegation that Greg White and other Oppenheimer executives knew in January 2008 that auction dealers, including Lehman Brothers, were contemplating exiting the ARS market. (Id. ¶ 82, 86.)  But the Plaintiffs do not specify how many other auction dealers were allegedly

25

contemplating exiting the market, whether these dealers managed
auctions for the ARS held by Plaintiffs, or what implications
White foresaw for the ARS market as a whole.

The Plaintiffs also argue that scienter can be inferred
from Oppenheimer's knowledge that, since March 2005, the "Big-4"
accounting firms, the Financial Accounting Standards Board
("FASB"), and the SEC took the position that ARS were not cash
equivalents.  An SEC staff interpretation issued in December
2005 stated in relevant part that, "because [] auction rate
securities have long-term maturity dates and there is no
guarantee the holder will be able to liquidate its holdings,
these securities do not meet the definition of cash equivalents
in paragraphs 8 and 9 of SFAS 95." (Declaration of Stephen L.
Ratner in Support of Oppenheimer's Motion to Dismiss ("Ratner
Decl.") Ex. 2.)

Oppenheimer argues that this document does not raise a
strong inference of scienter.  First, Oppenheimer correctly
notes that courts generally do not accorded great weight to SEC
staff interpretations. See Christensen v. Harris County, 529
U.S. 576, 587 (2000) (holding that such interpretations not
arrived at after formal rulemaking are not accorded deference
and are only entitled to respect to the extent that the
interpretations are persuasive); Gryl ex rel. Pharms. Group PLC
v. Shire Pharms. Group PLC, 298 F.3d 136, 148 n.1 (2d Cir. 2002)

26

("It must be remembered . . . that SEC no action letter
responses are staff interpretations rather than formal
Commission action and thus are of more limited utility than
formal rulemaking or policies announced in SEC releases.")
(internal quotation marks omitted).  Moreover, because the
document does not carry the force of law, Oppenheimer's alleged
failure to follow the letter's dictates was not "deliberately
illegal behavior." South Cherry St., 573 F.3d at 110 (internal
quotations omitted).

Oppenheimer also argues that the document deals with the
accounting treatment of ARS and does not address the
acceptability of any particular ARS marketing practices.[2]
Oppenheimer points out that the same letter noted that ARS were

---

[2] Even in cases where accounting fraud is at issue, the failure
to comply with accounting rules or interpretations does not
necessarily give rise to an inference of scienter.
"[A]llegations of GAAP violations or accounting irregularities,
standing alone, are insufficient to state a securities fraud
claim." Novak, 216 F.3d at 309.  "Only where such allegations
are coupled with evidence of 'corresponding fraudulent intent,'
might they be sufficient." Id. (citation omitted). See, e.g., In
re Ambac Fin. Group, Inc. Sec. Litig., No. 08 Civ. 411 (NRB),
2010 WL 727227, at *25 (S.D.N.Y. 2010) (holding that accounting
violations, standing alone, do not constitute a securities fraud
claim unless coupled with evidence of fraudulent intent); In re
Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 567
(S.D.N.Y. 2004) (holding that misapplication of complex
accounting principle did not show scienter); Funke v. Life Fin.
Corp., 237 F. Supp. 2d 458, 468-69 (S.D.N.Y. 2002) (holding that
violation of accounting rule did not show scienter due to
ambiguities in accounting principle).

in fact "considered highly liquid by market participants because of the auction process." (Ratner Decl. Ex. 2.)

### iii. Imputing Scienter to Corporate Defendant

The Plaintiff's allegations of scienter appear less cogent when the alleged scheme is viewed as a whole. "When the defendant is a corporate entity," as here, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445, 531 F.3d at 195. Generally, a plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment. See Defer, 654 F. Supp. at 212.

The Plaintiffs allege that Oppenheimer's financial advisors themselves were misled and ill-informed about ARS due to Oppenheimer management's actions. (Compl. ¶¶ 107-09.) According to Plaintiffs, "Oppenheimer's financial advisors lacked even a rudimentary understanding about auction rate securities and how the auction rate securities market functioned during the Class Period." (Id. ¶ 109.) Why the financial advisors lacked this knowledge is less clear from the Complaint. Plaintiffs allege that "Oppenheimer failed to provide mandatory instruction or compliance training about auction rate securities to its financial advisors." (Id. ¶ 108.) Plaintiffs also allege that

the financial advisors "were required to and did use uniform, standardized, and materially identical sales pitches created and/or approved by Oppenheimer's senior management to market and sell [ARS] to Plaintiffs." (Id. ¶ 165.)

In any event, Plaintiffs do not assert that the financial advisors acted with scienter and thus must identify some other employee whose intent or recklessness should be imputed to Oppenheimer. Plaintiffs attempt to do so by pointing to Greg White, who purportedly made training presentations to financial advisors. (Id. ¶ 108.)

Plaintiffs' allegations regarding White's role in the alleged fraud do not give rise to a strong inference that he acted with the requisite state of mind. Plaintiffs neither allege facts showing that White possessed a motive to defraud, nor that he engaged in behavior exhibiting conscious misbehavior or recklessness. First, for reasons discussed supra Part II.B.1.i, Plaintiffs' allegations regarding White's sale of ARS holdings during the Class Period are insufficiently specific to give rise to an inference of a motive to defraud. Second, White's alleged behavior does not evince a reckless or willfully fraudulent state of mind.

Plaintiffs' merely allege that "[i]n general, White's presentations did not include a discussion of the maximum rates applicable to auction rate securities, the auction dealers'

practice of supporting the auctions, the risk of auction failures, or the risk of illiquidity." (Id. ¶ 108.)   The Plaintiffs do not allege that White directed financial advisors to market ARS as cash-equivalent, safe, or highly liquid investments. (Id.)   The Plaintiffs also do not allege that White gave presentations to either of the financial advisors who sold ARS to Plaintiffs or, if he did, that he omitted the information that he omitted "in general." (Id.)   Finally, the Plaintiffs do not specify when these presentations occurred or, crucially, what information White had access to when he made these presentations.

In an attempt to bolster their argument, Plaintiffs also allege that "Oppenheimer directed its financial advisors throughout the United States to represent to investors in its written materials and uniform sales presentations that auction rate securities were equivalent to cash and were safe, highly liquid, short-term investment vehicles." (Compl. ¶ 101.)   This conclusory allegation does not meet the heightened pleading standards of the PSLRA. See Defer LP, 2009 WL 2971072, at *6–7 (holding that similar allegations of a company-wide scheme to promote and sell ARS were insufficiently specific to satisfy Rule 9(b)); Zisholtz, 2009 WL 3132907, at *5 (holding that plaintiffs did not satisfy the PSLRA where plaintiffs alleged that corporate officials "issued management directives and

uniform sales materials" but failed to "identify any of these officials by name, by title, or even by job description"). Plaintiffs do not specify who issued the alleged management directives, when they issued them, or where they issued them. Without this information, it is impossible to assess whether the circumstances under which the directives were issued give rise to an inference that Oppenheimer management was acting with scienter.

Although "it is possible . . . 'to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud,'" Teamsters Local 445, 531 F.3d at 195 (quoting Makor Issues, 513 F.3d at 710), Plaintiffs have not offered any grounds for doing so here.  Such an inference is appropriate where a corporate statement is so important and dramatic that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." Id. at 196 (quoting Makor Issues, 513 F.3d at 710, and giving the example of General Motors announcing that it had sold one million SUVs in a year when the actual number was zero).  The Plaintiffs in this case have not alleged a similarly dramatic corporate statement. Absent specific facts detailing the alleged uniform management directives, there is no basis on which to impute scienter to the corporate entity.

iv.  Competing Inferences

In evaluating whether the Complaint gives rise to a strong inference of scienter, Plaintiffs' allegations must be considered in their entirety, and plausible opposing inferences must be taken into account. Tellabs, 551 U.S. at 322-23.  "An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98, 111 (2d Cir. 2009).  Such is the case here.

Plaintiffs' basic theory is that high-level Oppenheimer officials issued management directives and uniform sales materials to Oppenheimer financial advisors regarding ARS, and that these directives were issued recklessly or with the intention to defraud because the prospect of ARS illiquidity was "either known to [Oppenheimer] or so obvious that [Oppenheimer] must have been aware of it." Novak, 216 F.3d at 308.  While this inference is plausible, it is not at least as strong as the inference that Oppenheimer negligently or carelessly provided insufficient training to its financial advisors and was merely negligent in not detecting and disclosing the imminent market collapse. See Zisholtz, 2009 WL 3132907, at *5 (deeming an inference largely identical to the one urged by Plaintiffs to be "weak and convoluted").

32

First, "the very market conditions . . . that Plaintiff[s] cite[] in [their] Complaint . . . give rise to an opposing and compelling inference that Defendants only engaged in bad (in hindsight) business judgments in connection with ARS, and did not engage in the alleged conduct with an intent to deceive investors." Citigroup, 2009 WL 2914370, at *6.  The Plaintiffs allege that the entire ARS market collapsed when all major broker dealers stopped submitting support bids around a single day. (Compl. ¶ 49.)  By Plaintiffs' own admission, this series of events was wholly unprecedented. (Id. ¶ 77.)  The more compelling inference to be drawn from the facts alleged in the Complaint is that Oppenheimer did not predict that all broker dealers would withdraw from the ARS market en masse.

This competing inference also arises from the allegations surrounding Oppenheimer's knowledge of the August 2007 auction failures and subsequent problems in the ARS market.  Given that the August 2007 failures occurred in a narrow segment of the ARS market that was "particularly undesirable," (Compl. ¶ 76), "were the first failures in the history of the auction rate securities market that occurred because auction dealers refused to continue to support the auctions," (id. ¶ 77), and that "auction dealers continued to intervene in [all other] auctions to prevent failures until around February 13, 2008," (id. ¶ 39), these allegations could also suggest that Albert Lowenthal and other

Oppenheimer executives did not believe the failures represented a threat to the remainder of the market.

The competing inference appears even stronger when considered in light of the lack of specificity that Plaintiffs provide regarding Oppenheimer's alleged uniform management directives.  The Plaintiffs do not specify who issued these directives, when they were issued, and whether the financial advisors in this case received the directives.  Plaintiffs' accusations regarding White's misleading sales presentations are equally unspecific.  The more compelling inference drawn from the allegations regarding Oppenheimer's sales directives and presentations is that Oppenheimer "carelessly or negligently provided training on how to sell auction rate securities, and because of improper training, many [Oppenheimer] brokers exaggerated the benefits and downplayed the risks of auction rate securities." Zisholtz v. Suntrust Banks, Inc., No. 1:08-CV-1287-TWT, 2009 WL 3132907, at *5 (N.D. Ga. Sep. 24, 2009).

"[A]llegations that defendants should have anticipated future events . . . do not suffice to make out a claim of securities fraud." Novak, 216 F.3d at 309.  Failing to predict the behavior of a third-party does not lead to an inference of intentionally fraudulent conduct or recklessness. See Novak, 216 F.3d at 309.  The Plaintiffs do not allege particular facts to support their assertion that Oppenheimer knew that it was

34

inevitable that auction dealers would withdraw their support for the auctions and that ARS would become illiquid. (Compl. ¶ 52.) This Court finds no reason to deem Plaintiffs' theory as plausible as the more cogent theory that Oppenheimer was caught off-guard by the exceptional turmoil in the financial markets and did not consciously or recklessly defraud investors.

Accordingly, Plaintiffs' Complaint against Oppenheimer fails to give rise to a strong inference of scienter and is DISMISSED.

As Plaintiffs have not adequately pleaded scienter, the Court declines to address Defendants' other grounds for dismissal of the Section 10(b) claim.


C.   Section 20(a) Claim

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . ." 15 U.S.C. § 78t (2006).  Section 20(a) liability is "necessarily predicated on a primary violation of securities law." Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004).  In order to establish a prima facie case of Section 20(a) liability, Plaintiff must prove "a primary violation by the controlled person and control of the primary violator by the

35

targeted defendant and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 (2d Cir. 1996) (internal quotation marks and citation omitted).

As the Court finds that Plaintiffs have failed to state a primary claim for liability under Section 10(b), Plaintiffs' control-person claim under Section 20(a) against Oppenheimer Holdings necessarily also fails and is DISMISSED.


Conclusion

For the foregoing reasons, Defendants' motion to dismiss [dkt. no. 30] is GRANTED, and Plaintiff's complaint against Defendants is dismissed in its entirety without prejudice. The Clerk of Court shall mark this action CLOSED and all pending motions DENIED as moot.


SO ORDERED:

DATED:     New York, New York
           September 27, 2010


_Loretta A. Preska_
LORETTA A. PRESKA, Chief U.S.D.J.